UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

AUGUST WALTER                          CIVIL ACTION

VERSUS                                 NO. 12-177

BP AMERICA, INC.                       MAGISTRATE JUDGE
                                       JOSEPH C. WILKINSON, JR.

### ORDER AND REASONS ON MOTIONS

In this action, plaintiff, August Walter, sued his former employer, BP America, Inc., contending that BP terminated his employment in retaliation for his complaints about BP's alleged violations of environmental law during the aftermath of the Deepwater Horizon oil spill, in violation of the Louisiana Whistleblower Statute, La. Rev. Stat. § 23:967, and the Louisiana Environmental Whistleblower Statute, La. Rev. Stat. § 30:2027.  Walter also asserts state law claims of intentional infliction of emotional distress, defamation, fraud and intentional misrepresentation under Louisiana law.

BP moved for summary judgment on all of plaintiff's claims, supported by excerpts from several depositions and by documentary exhibits.  Record Doc. No. 54. Defendant argues that (1) Walter's claim under the Louisiana Whistleblower Statute, La. Rev. Stat. § 23:967, is preempted by the more specific Louisiana Environmental Whistleblower Statute, La. Rev. Stat. § 30:2027; (2) plaintiff has no evidence that BP violated any <u>state</u> law (as required under the Louisiana Whistleblower Statute), or committed any of the alleged retaliatory acts in Louisiana, so that Louisiana law does not

apply; (3) if Louisiana law does apply, Walter cannot establish a prima facie case of retaliation under the Louisiana Environmental Whistleblower Statute because there is no evidence that he engaged in any protected activity; (4) BP has articulated legitimate, non-retaliatory reasons for terminating plaintiff's employment and he has no evidence that the reasons were a pretext for retaliation; (5) Walter has no evidence that BP had an illicit motive for terminating his employment; and (6) plaintiff has no evidence to support each of the elements of his claims of intentional infliction of emotional distress, defamation, fraud and misrepresentation under Louisiana law.[1]

Plaintiff filed a memorandum in opposition to defendant's motion for summary judgment. Record Doc. No. 98. He supports his opposition with complete deposition transcripts of numerous witnesses, declarations under penalty of perjury and documentary exhibits, which he filed into the record as separate documents. Record Doc. Nos. 90-96, 99-105. BP received leave to file a reply memorandum. Record Doc. Nos. 112, 118, 119.

On February 13, 2014, the court heard oral argument regarding BP's motions for summary judgment and to exclude the expert opinions of Marc L. Zimmerman, Ph.D., M.P., Record Doc. No. 52; John J. Muggivan, LCSW, ACSW, DCSW, M.E., Record Doc. No. 53; and Michele Allen, LCSW, Record Doc. No. 51. Considering the

---

[1]BP also argues that Walter cannot establish a claim of negligence. I see no such claim in Walter's original or amended complaint. All of his allegations and causes of action under La. Civ. Code art. 2315 refer to intentional actions.

discussion in open court regarding the planned deposition of Katherine Martinez, which was scheduled to be taken on February 19, 2014; the amount of time available before the scheduled trial date; the facts and complexity of this case; the already voluminous summary judgment record; and all of the demands on counsel's time and the court's, I found that a continuance of the trial was appropriate.  Accordingly, I continued the final pretrial conference and trial dates.  I ordered that none of the other dates and deadlines previously set in the court's scheduling orders are extended; that no further discovery may be conducted, except the deposition of Martinez, which had been previously ordered; and that the summary judgment record is closed as to both evidence and briefing, except to permit the parties to take Martinez's deposition, file it in the record and designate lines of the deposition for the court's particular attention.  Record Doc. No. 134.

BP filed the complete transcript of Katherine Martinez-Vitela's deposition, including its exhibits.  Record Doc. No. 150.[2]  Each party designated particular lines of the deposition for the court's attention.  Record Doc. Nos. 151, 158.  BP received leave to file supplemental designations in response to plaintiff's designations.  Record Doc. Nos. 161, 162, 163.

---

[2]Plaintiff previously filed the deposition and its extremely voluminous exhibits in numerous record documents, broken up into exhibits that generally contained only a few pages each.  Record Doc. Nos. 136-148.  Defendant's submission at Record Doc. No. 150 contains the entire deposition transcript and all of its exhibits in one record document.

Having considered the complaint, as amended, the submissions of the parties, and the applicable law, and for the following reasons, IT IS ORDERED that defendant's motion for summary judgment is GRANTED and that plaintiff's claims are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that defendant's motions to exclude the expert opinions of Marc L. Zimmerman, Ph.D., M.P., Record Doc. No. 52; John J. Muggivan, LCSW, ACSW, DCSW, M.E., Record Doc. No. 53; and Michele Allen, LCSW, Record Doc. No. 51, are DISMISSED AS MOOT.

I.    STANDARD OF REVIEW FOR SUMMARY JUDGMENT MOTIONS

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Rule 56, as revised effective December 1, 2010, establishes new procedures for supporting factual positions:

> (1)  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

4

> (B) showing that the materials cited do not establish the
> absence or presence of a genuine dispute, or that an adverse
> party cannot produce admissible evidence to support the fact.
>
> (2)  Objection That a Fact Is Not Supported by Admissible Evidence.  A
> party may object that the material cited to support or dispute a fact cannot
> be presented in a form that would be admissible in evidence.
>
> (3)  Materials Not Cited.  The court need consider only the cited materials,
> but it may consider other materials in the record.
>
> (4)  Affidavits or Declarations.  An affidavit or declaration used to support
> or oppose a motion must be made on personal knowledge, set out facts that
> would be admissible in evidence, and show that the affiant or declarant is
> competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Thus, the moving party bears the initial burden of identifying those materials in the record that it believes demonstrate the absence of a genuinely disputed material fact, but it is not required to negate elements of the nonmoving party's case.  Capitol Indem. Corp. v. United States, 452 F.3d 428, 430 (5th Cir. 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to [a particular material] fact."  Advisory Committee Notes, at 261.

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  No genuine dispute of material fact exists if a rational trier of fact could not find

for the nonmoving party based on the evidence presented.  Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd., 40 F.3d 698, 712 (5th Cir. 1994).

To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must cite to particular evidence in the record to support the essential elements of its claim.  Id. (citing Celotex, 477 U.S. at 321-23); accord U.S. ex rel. Patton v. Shaw Servs., L.L.C., 418 F. App'x 366, 371 (5th Cir. 2011).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial."  Celotex, 477 U.S. at 323; accord U.S. ex rel. Patton, 418 F. App'x at 371.

"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."  Edwards v. Your Credit, Inc., 148 F.3d 427, 432 (5th Cir. 1998); accord Murray v. Earle, 405 F.3d 278, 284 (5th Cir. 2005).  "We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."  Badon v. R J R Nabisco Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quotation omitted) (emphasis in original).  "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'"  Nat'l Ass'n of Gov't Employees, 40 F.3d at 713 (quoting Anderson, 477 U.S. at 249).

6

"Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation omitted) (emphasis in original); accord Duron v. Albertson's LLC, 560 F.3d 288, 291 (5th Cir. 2009).

II.   UNDISPUTED FACTS

The following material facts are established by the competent summary judgment evidence and are accepted as undisputed solely for purposes of the pending motion for summary judgment.  Material fact disputes are construed in the light most favorable to plaintiff when there is a conflict between his testimony and that of other witnesses.

Plaintiff has a bachelor's degree in homeland security and a master's degree in emergency and disaster management.  He has worked with and taken courses in the Incident Management System.

After the explosion of the Deepwater Horizon oil well in the Gulf of Mexico in April 2010, Walter worked as a contractor for BP in the oil cleanup efforts.  He was Branch Planning Lead in St. Bernard Parish in 2010.  Between November 2010 and May 9, 2011, still working as a contractor, Walter was Branch Planning Lead for the state of Mississippi, with his office located there.  He applied for that same position and was hired by BP as its own employee on May 9, 2011.  This was a supervisory position.

By 2011, the oil cleanup efforts were focused on the beaches and marshes along the shores of Louisiana, Mississippi, Alabama and Florida. Walter held dual roles for BP as Mississippi State Planning Lead in the Gulf Coast Restoration Organization and as Branch Planning Lead in the Incident Command System. Kiran Chaudhari, BP Deputy Planning Section Chief, was plaintiff's supervisor for both of plaintiff's roles. Chaudhari reported to Carla Fontenot, who was Vice President of Operations in the Gulf Coast Restoration Organization. Fontenot and Chaudhari were located in New Orleans.

BP fired Walter on December 9, 2011. Fontenot made the decision to fire him. Chaudhari agreed with her decision.

About seven months earlier, on April 19, 2011, a contract employee named Mike Rimpley had made a complaint against Walter on BP's "Open Talk" employee complaint telephone line. Rimpley alleged that Walter and another contract worker, Cory Brown, had been verbally abusive to contract workers Tammy O'Dell and Cheryl McLeod, and that plaintiff's BP supervisor at the time, Derwin Henley, did not address the problem when he was informed about it.

Ethel Nicholas of BP's Human Resources Department investigated the complaint. Rimpley, O'Dell and McLeod told Nicholas that Walter had used vulgar language. Walter denied at that time, and continues to deny now, that he did so.

Stephanie Klingler, Human Resources Officer for the Gulf Coast Restoration Organization and the Incident Command System, reviewed the results of Nicholas's

investigation and prepared a written report dated May 25, 2011.  In her final report, which was sent to Fontenot (who was Walter's direct supervisor at the time) and Keith Baker, BP's Human Resources Director, on July 11, 2011, Klingler concluded that the specific vulgar comment that plaintiff had allegedly made could not be completely substantiated.  However, she found that the evidence as a whole demonstrated that Walter had violated BP's Code of Conduct by engaging in offensive, intimidating, malicious or insulting behavior.  Record Doc. No. 54-18 at p. 2, Defendant's Exh. B-5, Klingler report dated May 25, 2011; Record Doc. No. 106-4, plaintiff's unnumbered exhibit, Klingler deposition at pp. 20-21, 23-25.

When Walter was hired as a BP employee on May 9, 2011, the hiring team, which included Fontenot, did not know that an Open Talk complaint and investigation were pending against him.  As a result of Klingler's report, Walter was placed on a "Plan Forward" that required him to undertake training in leadership behavior and appropriate conduct, including BP's Code of Conduct.  He was told that additional misconduct could result in discipline.  Fontenot and Klingler worked with him on his Plan Forward.

Other BP employees in the Mississippi state office included Henley, who was Area Operations Manager and Branch Director of the Mississippi office, and Cory Brown, Response Lead and Deputy Branch Manager.  Robert "Mike" Harrison was Operations Section Chief for the Incident Command System and was located in New Orleans.  None

9

of these Operations personnel had the authority to hire or fire Walter, who was in the Planning section, and Walter did not report to them.

Plaintiff's job duties and "key accountabilities" as Mississippi State Planning Lead included reporting noncompliance with environmental laws, regulations and rules and ensuring that all work and job plans met all health, safety, security and environmental compliance and regulatory requirements and.  He tracked compliance with directives that came from the Federal On Scene Coordinator, who was a captain in the United States Coast Guard and was in overall charge of the coordinated cleanup efforts.  He developed plans for the work that Operations would do; tracked and documented the work that was accomplished; made sure the work was in compliance and, if there was non-compliance, gave notice and attempted to make corrections; identified and reported variances from plans; and documented what was actually cleaned versus what had been planned to be cleaned.  Mississippi was his only state of responsibility.

In addition to the Planning and Operations sections, the Incident Command System had an Environmental section that worked with the Shoreline Cleanup Assessment Teams.  Shoreline Cleanup Assessment Teams were independent third parties, consisting of scientists and representatives of each of the involved federal and state agencies, which inspected the beaches to identify work that needed to be done.  The Shoreline Cleanup Assessment Teams created Shoreline Treatment Recommendations that defined the cleaning criteria, the resources to be used and the areas to work.  The

Shoreline Treatment Recommendations were circulated to the interested state, Coast Guard and landowner parties, who signed off on the final versions. The Incident Command System also had Branch Action Plans and Incident Action Plans, which included all of the Branch Action Plans.

The Shoreline Treatment Recommendations, Branch Action Plans and Incident Action Plans were tools and guides to assist in accomplishing the oil spill response efforts by identifying resources, equipment, best practices and cleanup end points established in the States' shoreline cleanup plans and in further guidance provided by the Federal On Scene Coordinator. These were dynamic documents subject to change and revision as the response work progressed. The Coast Guard, through the Federal On Scene Coordinator, had 51 percent of the vote and BP had 49 percent of the vote regarding any plans.

The Federal On Scene Coordinator had the final say regarding whether the cleanup had been performed satisfactorily and completed to the standards agreed upon by the numerous state and federal parties participating in the Incident Command System. Before a segment of land could be presented to the Federal On Scene Coordinator as clean, the segment was inspected multiple times by the independent Shoreline Cleanup Assessment Teams. While BP participated in the inspection process, it had no direct control over the independent determination that a segment was clean.

During the time period of September to November 2011, plaintiff's supervisor Chaudhari became more aware of issues with the team dynamics and teamwork in the Mississippi office.  As part of his job to manage employee performance, he found it necessary to coach Walter, Henley and Brown regarding teamwork.  Record Doc. No. 99-9, plaintiff's unnumbered exhibit, Chaudhari deposition at pp. 43-45.

On Friday, October 14, 2011, Walter quit his job with BP.  He testified that he quit because BP was not following the Shoreline Treatment Recommendations and Branch Action Plans.  He testified that his conduct in quitting was a statement that BP was not following the plans.  He stated that he never told anyone at BP that BP had "violated the law," but he did tell unspecified persons at unspecified times that BP was violating the Shoreline Treatment Recommendations.  Record Doc. No. 54-9, Defendant's Exh. A-2, Walter deposition, Vol. II at pp. 273, 275; Record Doc. No. 100, plaintiff's unnumbered exhibit, Walter deposition, Vol. II at p. 45.

Fontenot learned that Walter had quit when Area Operations Manager and Mississippi Branch Director Henley called to tell her that plaintiff had quit and that Henley "was not far behind him."  Henley told Fontenot that Walter "blew up, he cursed, he jumped in his car and he had then proceeded to lock himself in his apartment."  Record Doc. No. 99-8, plaintiff's unnumbered exhibit, Fontenot deposition at pp. 71-72.  After plaintiff returned to work the next Monday, Henley "expressed [to Fontenot] a concern that he was afraid to deal with issues related to Walter's behavior because he

was afraid that Augie [Walter] would quit" again.  Record Doc. No. 99-8, plaintiff's unnumbered exhibit, Fontenot deposition at p. 74.

The night that plaintiff quit, he met at his apartment with Henley; Brown, the Mississippi Response Lead and Deputy Branch Manager; and Monique Boudreaux, a performance analyst in the Planning Section, who was usually located in New Orleans, but was working in Mississippi at that time.  Walter told them that people at work were not treating him well and were not listening to him.  Henley and Boudreaux asked him to return to work.

Chaudhari telephoned Walter on Sunday, October 16, 2011, and also asked him to return to work.  Chaudhari was concerned about plaintiff's mental state and stress level because Chaudhari found it unusual that Walter had quit so suddenly.  The issues that Walter raised with Chaudhari during their telephone conversation were about communication and organization in the Mississippi office; specifically, plaintiff's frustration with a perceived lack of communication and organization by Henley and Brown.  Chaudhari referred Walter to BP's Employee Assistance Program, which has counselors available to talk with and provide support to employees. Chaudhari's concern about Walter's mental state prompted Chaudhari to tell him during the same conversation that plaintiff could call Chaudhari any time of the day or night.  Record Doc. No. 54-9, Defendant's Exh. A-2, Walter deposition, Vol. II at pp. 275-77; Record Doc. No. 54-14, Defendant's Exh. A-6, Chaudhari deposition at pp. 62-63; Record Doc. No. 99-9,

13

plaintiff's unnumbered exhibit, Chaudhari deposition at pp. 62-66, 68; Record Doc. No. 99-11, plaintiff's unnumbered exhibit, Boudreaux deposition at pp. 26- 28.

Walter testified that, during their discussions that weekend, he told Chaudhari and Henley that he would return to work only if things were done in accordance with the Shoreline Treatment Recommendations and Branch Action Plans in the future.  Record Doc. No. 54-9, Defendant's Exh. A-2, Walter deposition, Vol. II at pp. 276-77.

After speaking with Chaudhari, plaintiff decided to return to work.  Brown, Henley and Boudreaux met with him again on Sunday, October 16, 2011, to discuss how they would move forward.  Walter wanted to have an additional person to help him in the Planning section when he returned.  At this meeting, he did not mention any displeasure with BP's cleanup efforts or whether Operations was picking up all of the oil.  He came back to work on Monday, October 17, 2011.

Amelia Peacock was brought in as a contract employee to assist Walter.  Plaintiff knew Peacock because she had worked on the oil spill response in the Planning section for a different contractor, TRG, and had been "demobilized" (or "demobed") in March 2011, meaning that she had been dismissed from the response.  Record Doc. No. 99-11, plaintiff's unnumbered exhibit, Boudreaux deposition at pp. 37-38, 70-71.

Boudreaux testified that, during her conversation with Walter and Henley, Walter asked that Peacock be re-hired.  She stated that Henley then prepared the paperwork to request Peacock and Peacock started working in Mississippi about a week later.  Record

14

Doc. No. 99-11, plaintiff's unnumbered exhibit, Boudreaux deposition at pp. 37-38. According to Boudreaux, plaintiff wanted to fire contract employee Brian Frampton and bring in a contract worker named Mike Turner about two weeks after Peacock was hired. Record Doc. No. 99-11, Boudreaux deposition at pp. 53-54.

Walter denies that he requested Peacock. He testified that he told Boudreaux and Henley that he wanted Turner, but that Henley wanted Peacock. Record Doc. No. 54-8, Defendant's Exh. A-2, Walter deposition, Vol. II at pp. 112-13; Record Doc. No. 100, plaintiff's unnumbered exhibit, Walter deposition, Vol. II at p. 261.

Sometime after Walter returned to work on October 17, 2011, Heidi Grether, the Government and Public Affairs Leader in the Mississippi office, contacted Klingler to tell her that "several people" in that office had complained to Grether about plaintiff's conduct, which had reportedly worsened since he returned to work. Grether brought the problem to Klingler's attention so that Human Resources would investigate. Record Doc. No. 54-12, Defendant's Exh. A-4, Klingler deposition at pp. 59-61, 74.

On October 31, 2011, Klingler called Walter and asked him if he had a personal relationship with Peacock and if he knew why Peacock had previously been demobilized. Walter replied that he had no personal relationship with Peacock. He told Klingler that Peacock had been demobilized for the "official reason" that TRG management did not like the way Peacock had handled the demobilization of another TRG employee and that the "unofficial reason, just scuttlebutt" was that Greg Goedecker, another TRG employee

15

working on the spill response, wanted to be the TRG state lead and had threatened to quit if he was not made Mississippi state lead.  Record Doc. No. 54-8, Defendant's Exh. A-2, Walter deposition, Vol. II at pp. 173-75; Record Doc. No. 54-12, Defendant's Exh. A-4, Klingler deposition at pp. 51, 62-63, 74; Record Doc. No. 54-29, Defendant's Exh. B-21, Klingler calendar entry for October 31, 2011.

Chaudhari testified that he told Klingler, at her request, how Peacock had been hired.  He stated that he asked his team for hiring recommendations for an open position and that Walter "specifically requested" that Peacock be hired.  Record Doc. No. 99-9, plaintiff's unnumbered exhibit, Chaudhari deposition at pp. 18-22, 25.

Walter prepared the slides for the Mississippi Branch that were used in regularly scheduled "Deep Dive" presentations for the Unified Incident Command in New Orleans. The Unified Incident Command included the Federal On Scene Coordinator and BP's Incident Commander, who was either Fontenot or her deputy.  Deep Dive was a tool developed by the Coast Guard for the Deepwater Horizon oil spill response to provide "situational awareness."  The Deep Dive presentations provided a snapshot of how many beach segments were cleaned or being worked and the estimated time of completion. Plaintiff did not attend these presentations.

On November 7, 2011, Walter and Brown had a confrontation in the Mississippi office in front of other personnel.  Brown asked Walter to change some items in the Deep Dive slide for Mississippi and told Walter to direct any questions about the changes to

16

Brown.  Walter refused to make the changes and told Brown, "You are not my boss." The volume of Walter's voice rose as Brown walked away from him.  Brown later came back and they continued their discussion inside Henley's office.

Walter e-mailed the Deep Dive slide to Operations Section Chief Harrison, Brown, Chaudhari and others without making any changes.  Harrison and Chaudhari each responded by e-mail almost immediately, asking Walter to explain what was going on. Chaudhari told plaintiff to talk to Harrison and find out what Harrison wanted.

Walter called Harrison the same day.  Harrison told plaintiff that he did not understand why Walter's current slide contained higher numbers of uncleaned segments than the slide that Harrison had presented at the Deep Dive presentation one week earlier. Harrison and Brown had changed the data on the prior slide without telling Walter in advance.  In their November 7, 2011 conversation, Walter told Harrison that some of the segments had failed to pass inspection and would need to be cleaned again.  Harrison responded, "Well, that's not the story I want to tell," and explained that he wanted to report only regarding segments that BP had not yet begun to clean.  Walter told Harrison that this did not match the format they had been using before Harrison and Brown changed the data for the previous presentation.

After talking to Harrison, Walter changed the slide as requested and e-mailed it to Harrison and the other parties with the cover notation, "I took the slide that you amended last week and used what you placed in there and changed the ratio per what has

passed/failed."   Record Doc. No. 106-3, plaintiff's unnumbered exhibit, Walter deposition, Vol. I at pp. 203-12, 218-21; Record Doc. No. 54-6, Defendant's Exh. A-1, Walter deposition, Vol. I at pp. 241-65; Record Doc. No. 54-7, Defendant's Exh. A-1, Walter deposition, Vol. I at pp. 270-72; Record Doc. No. 54-29, Defendant's Exhs. B-23 through B-26, e-mail thread dated November 7, 2011.

The difference between the two slides was whether the data concerning land segments to be cleaned on two Mississippi islands should include segments that had been cleaned, but had failed to pass inspection.  Walter's original slide included two segments on Horn Island that had failed inspection with the language "22 of 56 segments requires [sic] cleaning by [Operations]."  Harrison wanted to report, and the changed slide did report, "20 segments [Operations] has not cleaned."  This report did not include the two segments that had been cleaned, but had failed inspection.  Similarly, for Petit Bois Island, Walter had originally stated "6 of 44 segments requires [sic] cleaning by [Operations]."  The changed slide stated "3 segments [Operations] has not cleaned," which again did not include the three segments that had failed inspection.  Record Doc. No. 54-29, Defendant's Exhs. B-24 (original slide), B-26 (revised slide).

Plaintiff never expressed to Fontenot or Boudreaux any concerns that BP was not cleaning any segments completely or was refusing to follow the cleanup protocol. Record Doc. No. 99-11, plaintiff's unnumbered exhibit, Boudreaux deposition at pp. 28, 71; Record Doc. No. 99-8, plaintiff's unnumbered exhibit, Fontenot deposition at pp. 56,

18

60-61, 98.  Chaudhari testified that the only time that Walter complained to him about BP not properly following any cleanup plans was during a meeting when plaintiff expressed concern that BP was cleaning at a level <u>greater</u> than the Shoreline Treatment Recommendations required.  Record Doc. No. 99-9, plaintiff's unnumbered exhibit, Chaudhari deposition at pp. 58-59.

Boudreaux testified about the same meeting that Chaudhari recalled, which she thought took place on September 26, 2011.[3]  Boudreaux was the moderator at a meeting with the Planning Leads and Response Leads for each state at which "there was a discussion of what does clean mean" in the context of the differing standards for non-amenity beaches and amenity beaches, which were used for recreation purposes and had stricter cleanup criteria.  She testified that Walter opined that BP's beach cleanup crews should not pick up tar balls that went beyond the amenity standards.  Tom Zimmer, the Incident Commander, left the meeting to talk to Capt. Hein, the Federal On Scene Coordinator, and returned to report that "we are going to pick up everything.  We're not going to . . . walk over a nickel or a dime-size residual of oil or a tar ball, we are going to clean the segments of the beach."  According to Boudreaux:  "And there was some discussion and displeasure by . . . Mr. Walter of this decision."  Zimmer told the Response and Planning Leads that "we are not to step over or – any tar balls.  We are to

_____

[3]Walter testified that this meeting occurred on September 29, 2011.  Record Doc. No. 100, plaintiff's unnumbered exhibit, Walter deposition, Vol. II at pp. 220-21.

pick up everything and clean – clean the beach [in all four states].  We're not going to step over any oil, even if it's below the one percent criteria or whatever the specifics of amenity standards were . . . .  [W]e're to pick up all tar balls."  Record Doc. No. 99-11, plaintiff's unnumbered exhibit, Boudreaux deposition at pp. 29-31, 33-34.

Fontenot received two telephone calls that prompted her to ask Human Resources to conduct an investigation of Walter in November 2011.  The first call was from Roy Barrett, the owner of TRG, the contractor that had previously demobilized Peacock from the oil spill response.  Barrett told Fontenot that he was concerned that Walter had rehired Peacock, when Walter knew that TRG had terminated Peacock for cause.  Record Doc. No. 54-13, Defendant's Exh. A-5, Fontenot deposition at p. 88.

The second call to Fontenot was from Brown on November 7, 2011, after Walter and Brown had argued.  Brown told Fontenot that he was concerned about Walter's behavior because plaintiff had yelled at Brown in front of the team.  Brown felt that Walter's conduct was degrading and controlling.  He told Fontenot that people in the Mississippi office were walking on eggshells around Walter and could not speak up.  He said that they had been trying to manage Walter's behavior in the office for a long time and that they could not stand one more day of it.  Record Doc. No. 99-8, plaintiff's unnumbered exhibit, Fontenot deposition at pp. 78, 87-88.  Fontenot asked Brown to talk to plaintiff specifically about what his conduct was doing to the team.  Brown replied that

he had already done so many times, and he felt that the team could not handle one more day of Walter's behavior.  Id. at pp. 45-46.

That evening, Fontenot told Klingler to conduct an investigation to determine the facts and ascertain whether Walter had engaged in inappropriate behavior.  Fontenot told Klingler about the telephone calls she had received from Barrett and Brown.  Fontenot told Klingler that Brown complained that Walter had yelled at him in front of several people.  Fontenot told Klingler that Brown was concerned about plaintiff's behavior and that Brown said that it was not the first time Walter had acted that way.  Id.

Fontenot expressed to Klingler her concern about plaintiff's behavior and the need to assess whether he might be a risk to himself or others during the investigation because he "had blown up previously and locked himself in an apartment."  Klingler suggested, and Fontenot approved, hiring Marc McElhaney, a psychologist, "to help us manage and understand that risk" by having Dr. McElhaney communicate with plaintiff.  Record Doc. No. 99-8, plaintiff's unnumbered exhibit, Fontenot deposition at pp. 80-81.

On November 8, 2011, BP placed Walter on administrative leave pending an investigation into his behavior.  Chaudhari spoke with Dr. McElhaney a few times during plaintiff's leave to keep himself informed about Walter's mental state and to assess any possible threat regarding Chaudhari's continued engagement with Walter while he was under investigation.  Record Doc. No. 99-9, plaintiff's unnumbered exhibit, Chaudhari deposition at pp. 78-80.

21

BP, through Klingler, retained an outside investigation firm, Employment Practices Solutions (sometimes referred to in the evidence as "EPS"), to conduct the inquiry.  Katherine Martinez-Vitela (the parties have referred to her as "Martinez" throughout this litigation) was assigned as the investigator.  Martinez is an experienced employment law attorney who worked as a consultant for Employment Practices Solutions.  She had conducted many prior investigations for BP and other clients of Employment Practices Solutions.  The questions she was asked to investigate included:

1.    Did Walter violate the "respectful, harassment-free workplace" provision of BP's Code of Conduct by engaging in offensive, intimidating, malicious or insulting behavior?

2.    Did plaintiff engage in any form of harassment with the intent or effect of creating a hostile or intimidating work environment or unreasonably interfering with an individual's work performance?

3.    Did Walter create a conflict of interest by having a personal relationship with Peacock?

4.    Did plaintiff bring in contract worker Peacock with knowledge that TRG previously asked her to leave and not return to work on a BP site?

5.    Did Walter deceive Klingler by telling her there was no reason why Peacock should not return to work for BP in Mississippi through a different contracting agency?

Record Doc. No. 54-30, Defendant's Exh. B-27, Employment Practices Solutions Confidential Investigation Report, at p. 2.  Martinez was also asked to investigate allegations that Henley knew about the problems with Walter's behavior, but failed to address them properly, in violation of BP's Code of Conduct regarding his supervisory

22

role.  As the investigation progressed, it expanded to include other allegations that arose regarding plaintiff's conduct.

Jeffrey Benedic, a TRG employee, worked as a contract worker for BP, first as the Operations Incident Action Plan Specialist and then as Incident Action Plan Lead under the Planning section of BP in New Orleans during 2011.  He had previously worked on the spill response with Walter in St. Bernard Parish in 2010.  Martinez interviewed Benedic during the investigation, and he sent her e-mails describing his experiences with Walter and Peacock and what he knew about them.

During 2010 and 2011, Benedic heard multiple complaints from TRG employees about how difficult they found it to work with plaintiff because he was controlling, sent mixed signals, required them to work late, told them they should return to work in Mississippi after a tropical storm and then denied that he had told them to do so. Specifically, Greg Goedecker, Andrew Woltje, Joe Buckley and Chris Coaker complained to Benedic about Walter in 2011.  As part of Benedic's job, he reported those complaints to TRG management in Houston, Texas, so that they would know about the complaints and could help him to handle them.

Peacock worked with Walter in the Planning section as a contract employee of TRG.  On March 25, 2011, TRG demobilized Peacock from the oil spill response for cause.  Benedic sent an e-mail to Walter and Henley on that date with Peacock's demobilization paperwork, which Benedic had filled out.  He checked the "no return

23

scheduled" box to indicate that TRG did not plan on bringing Peacock back to work. She was demobilized because she had participated in a conference call with other TRG employees during which she was told that the call was confidential, but she promptly revealed the contents of the call to Walter and possibly Henley. Benedic decided to terminate Peacock's employment with TRG because she did not follow a clear directive to keep the call confidential. Benedic testified that he contacted Walter and told him that Peacock was being demobilized for failing to follow directives.

TRG decided that Goedecker would replace Peacock in the Mississippi branch office. Several weeks before November 18, 2011, Goedecker told Benedic that he was "self-demobilizing," or quitting the oil spill response, because he could no longer work with plaintiff. Goedecker generally told Benedic that Walter had constant mood swings. Benedic conveyed all of this information to Martinez both orally and via e-mail, and sent her some notes written by Goedecker, Woltje, Buckley and Coaker, confirming their own complaints about Walter's conduct. Record Doc. No. 99-10, plaintiff's unnumbered exhibit, Benedic deposition at pp. 6-7, 12, 21-22, 29-34, 38-50, 52-54, 60-61, 71-77, 81, 83-84, 91; Record Doc. No. 54-30, Defendant's Exhs. B-27 (Martinez final investigation report), B-28 and B-29 (e-mails from Benedic to Martinez); Record Doc. No. 150, Martinez deposition at pp. 81-87, 249-50; Record Doc. No. 150-3 at pp. 46-58, Defendant's Exhs. 9, 10, 11 and 12 to Martinez deposition (e-mails from Benedic to Martinez conveying statements from Goedecker, Woltje, Buckley and Coaker).

Martinez reviewed numerous documents and interviewed 18 people, some of them more than once.  She rendered a written report to BP dated December 1, 2011, which included detailed reports of the interviews and other evidence.  Martinez concluded that:

1.   Walter verbally attacked Brown, demeaned many employees and became easily angered when asked for guidance and clarification.

2.   Plaintiff violated the "respectful, harassment-free workplace" provision of BP's Code of Conduct by engaging in offensive and intimidating behavior.  Among other intimidating behavior, Walter demeaned other employees, yelled at them and reprimanded them for speaking to each other.

3.   Plaintiff's conduct created an intimidating work environment that unreasonably interfered with an individual's work performance.  He made others feel incompetent when they did not understand his directives or when they followed his directives that later changed when they submitted their work to him.  He scolded them for speaking to each other and reprimanded them for responding to external requests for information without obtaining his permission.  Those interviewed who had experienced his "increasing[ly] frequent outbursts and explosiveness" were concerned for their own safety.

4.   The evidence supporting the allegation that Walter and Peacock had sent sexually suggestive text messages to each other by cell phone ("sexted") was "inconclusive."  However, Walter admittedly had confronted Brian Frampton about Frampton allegedly viewing the messages.  "It stands to reason that Walter impliedly acknowledged some sexting transpired between he and Peacock since Walter accused Frampton of viewing the sexting messages."

5.   Walter and Henley both knew that TRG had demobilized Peacock with "no return," which was stated in the March 25, 2011 demobilization paperwork.

6.   Based on the many witnesses who participated in conversations with Walter and Henley about Peacock's demobilization, both men "knew the specific circumstances and basis for demobing Peacock with no return."

25

7.   Walter deceived Klingler when he told her that no reason existed to prevent Peacock from returning to work at a BP site.

8.   Walter refused to pay overtime to Goedecker, Frampton and Coaker, admittedly replacing overtime pay with "potential comp time."

9.   Henley was aware of Walter's conduct, knew the reasons that Peacock had been demobilized for cause and knew that plaintiff refused to pay overtime, but did nothing to address these concerns with Walter.

10.  . . . .[4]

11.  Walter started a side business, TCAAS, in July 2011 and tried to recruit BP employees and Frampton to work for him.  Peacock admittedly is Walter's employee at TCAAS.

12.  Walter failed to notify BP of this side business.

Record Doc. No. 54-30, Defendant's Exh. B-27, Martinez report; Record Doc. No. 54-12, Defendant's Exh. A-4, Klingler deposition at pp. 53-56.

Fontenot did not receive a copy of Martinez's report, but Klingler discussed the findings with Fontenot.  Fontenot then decided to terminate Walter's employment. Record Doc. No. 54-13, Defendant's Exh. A-5, Fontenot deposition at pp. 33, 40; Record Doc. No. 54-12, Defendant's Exh. A-4, Klingler deposition at pp. 52, 83.

On December 9, 2011, Chaudhari delivered a termination letter to Walter.  The letter, which was drafted by Human Resources for Chaudhari's signature, said that plaintiff had been notified in July 2011 that he had violated BP's Code of Conduct "for exhibiting poor leadership behaviors in relation to respectful treatment of others" and that

---

[4]Finding No. 10 deals solely with Henley's breach of the Code of Conduct as a supervisor.

"additional misconduct could result in discipline." The letter stated that an investigation was undertaken as a result of additional allegations that were raised about Walter's behavior in October and November 2011, and that the investigation

> revealed that you violated the BP Code of Conduct and BP policies on multiple counts. Specifically, you (i) hired a contractor with a clear conflict of interest, (ii) lied to the investigator and [Human Resources] regarding your knowledge of a contractor's prior separation from the site; and, (iii) failed to treat employees and contractors fairly or with dignity and respect, by among other conduct, yelling at staff and preventing staff, through the use of threatening behavior, from communicating on business matters with others.

Record Doc. No. 54-16, Defendant's Exh. B-1, termination letter dated December 9, 2011. Chaudhari agreed with the reasons stated in the letter. Record Doc. No. 99-9, plaintiff's unnumbered exhibit, Chaudhari deposition at p. 13.

Walter contends that Martinez's interview notes do not reflect everything that he told her and that her report contains inaccurate findings. He testified that he told her that he wanted to hire Turner when he returned to work after quitting, but that Henley wanted Peacock. He said he told her that his reason for quitting was that BP was not following the plans and not doing what it was supposed to do. He denied that he ever accused Frampton of looking at his cell phone and at text messages between plaintiff and Peacock. Walter denied that Benedic called him in March 2011 to tell him that Peacock was being demobilized for breaching confidentiality, although Walter knew that TRG had reasons for letting her go. He admitted that he was copied on Benedic's e-mail

stating that Peacock was demobilized for not following directives and that he received the paperwork that her demobilization was without return.  Plaintiff denied that he had a side business and denied that Peacock worked for him in a side business.  Record Doc. No. 100, plaintiff's unnumbered exhibit, Walter deposition, Vol. II at pp. 50-51, 72-73, 112-13, 119, 139-51, 154-56.

Martinez's deposition testimony elaborates on the evidence she collected, explains some of her handwritten notes and confirms that the findings in her report were based on the evidence she gathered.  According to her testimony and interview notes, Walter admitted to Martinez that he knew that TRG had demobilized Peacock for cause in March 2011.  However, he said he did not know that the reason for her demobilization was that Peacock had not followed directives or had leaked confidential information.  The demobilization paperwork stated that Peacock was demobilized with no return, which meant that she would not be rehired.  Plaintiff saw that paperwork.  Both Peacock and Benedic told Martinez that Walter knew from each of them that Peacock had been demobilized because she had not followed directives or had leaked confidential information.  Record Doc. No. 150, Katherine Martinez-Vitela deposition at pp. 74-81, 148-49.  Martinez therefore concluded that plaintiff had lied to her and to Klingler when he denied knowing and failed to disclose that Peacock had been demobilized with no return.  Id. at pp. 149-50, 253.

Martinez received evidence during her investigation, including her personal observations of Walter during her interview of him, of his controlling, inconsistent, unprofessional, offensive, angry and unpredictable behavior.   His conduct caused bottlenecks in tasks being accomplished at work; made employees uncomfortable, fearful and stressed out about working with him; and caused some of them to be concerned about Walter's safety and/or their own safety.  Id. at pp. 60-65, 81-87, 115, 123-24, 155-56, 165-67, 169-70, 190, 247.

Although Walter denied that he had an "argument" with Brown on November 7, 2011, he admitted that his voice rose when he refused to change the Deep Dive slide when Brown asked him to do so and that their confrontation occurred where other people were present.  Witnesses told Martinez that plaintiff yelled at Brown in front of other employees.  Martinez's finding that Walter "verbally attacked Brown" was based on the manner in which he addressed Brown, not on the substance of their argument.  Martinez never heard that the reason for the argument was that Brown wanted Walter to falsify data.  Id. at pp. 111-12.

Martinez intended to interview Delyte Montoya of the Coast Guard, who may have witnessed the argument between Walter and Brown.   Baker and Klingler discouraged Martinez from talking to Lt. Montoya.  They encouraged Martinez to try to find another way to get the information she needed.  Martinez was not interested in talking to Lt. Montoya regarding whether Walter had complained about BP not following

29

the law, because that was not an issue that anyone raised to Martinez during her investigation.  Martinez wanted to talk to Lt. Montoya about Lt. Montoya's observations of the argument between Walter and Brown and about whether Henley had asked Montoya not to tell anyone that Walter had quit in October 2011.  After hearing from Baker and Klingler that they preferred that she not contact the Coast Guard, Martinez agreed to pursue other avenues to obtain relevant information.  After interviewing 18 people and reviewing various documents, Martinez believed that she had sufficient, corroborated evidence to reach the conclusions stated in her final report.  Id. at pp. 37-44, 113-14, 119, 239-40; Record Doc. No. 150-2 at pp. 11-13, Defendant's Exh. 3 to Martinez deposition, e-mails between Martinez and Klingler and between Martinez and Keith Baker, dated November 15 and 17, 2011.

Martinez did not need permission from anyone at BP to talk to any BP employee and no one resisted her talking to any BP employee.  She interviewed more people than were on the list of suggested interviews that Klingler gave her initially because other names came up during her investigation.  Record Doc. No. 150, Martinez deposition at pp. 133-36, 230-31.  As to employees of third-party contractors who may have observed plaintiff's conduct, BP did not limit Martinez to talking only to TRG and did not encourage her to talk to Benedic.  As a courtesy to third-party contractors, she coordinated through BP when she needed to talk to third-party employees.  Martinez

decided to interview Benedic herself, so she could independently verify information that other witnesses told her.  Id. at pp. 35-36, 167-68, 230, 248-49.

During her investigation, no one ever advised Martinez that there were issues regarding plaintiff having made complaints about BP violating the law, falsifying data, failing to clean islands properly or using vessels improperly.  Record Doc. No. 150, Martinez deposition at pp. 38, 162, 190, 200, 202-03, 206, 208-09, 216-18, 222.  She testified that Walter never mentioned these issues and never said that he quit because BP was not following the plans.  Id. at pp. 67-68, 70-71, 261-64.

Martinez's contemporaneous, handwritten notes taken during her interview of Walter on November 18, 2011, contain nothing about any complaints by him about any of these issues.  Defendant's Exh. 4 to Martinez deposition, Record Doc. No. 150-2 at pp. 99-100 and Record Doc. No. 150-3 at pp. 1-27.  Martinez testified that the only time Walter raised "some sort of whistle-blowing issue" was in an e-mail dated December 7, 2011, that he sent to her almost three weeks after she interviewed him and several days after she had finalized her report.  Walter had an opportunity to respond to all of the allegations during his lengthy interview with Martinez.  She gave him her contact information and told him to contact her within a week if he wanted her to consider anything else.  Record Doc. No. 150, Martinez deposition at pp. 38, 68, 248, 262-63; Record Doc. No. 150-3 at p. 44, Defendant's Exh. 8 to Martinez deposition, e-mail from Walter to Martinez and Fontenot dated December 7, 2011.

Martinez could not corroborate from any other source the allegation by another employee, Michelle Butler, that Butler had seen what she interpreted as a "sexting" message on plaintiff's cell phone.  Walter and Peacock denied to Martinez that they had sent sexting messages to each other.  Because of the lack of corroboration, Martinez found that the evidence was inconclusive about that particular allegation.  She noted in her final report that Walter's admitted confrontation of Frampton about whether Frampton had seen sexting messages on Walter's cell phone at least impliedly acknowledged that such messages had been sent.  Id. at pp. 88-94, 121-22, 140-41, 144-47.  Despite the inconclusive evidence about sexting, Martinez concluded that the evidence otherwise supported a finding that Walter and Peacock had a personal relationship and that Walter requested that BP re-hire Peacock.  Id. at pp. 253, 266-67.

Martinez testified that, during the numerous investigations that she conducted for BP, its legal department sometimes revised the reports that she provided and sent them back to her to incorporate changes.  She could not recall if that was done in this case.  She stated that there was concern at Employment Practices Solutions and on her part about the independence of the report if BP's legal department revised it.

Martinez initially provided an oral report to Chaudhari and Klingler, then provided a few drafts of her written report to Klingler and Baker.  BP had input during this process and some revisions were made before Martinez submitted her final report.  She could not recall any specific deletions from or additions to the final report.  Id. at pp. 99-100, 139,

32

251-52. She testified that BP might have made suggestions regarding the language of her findings, which she cannot now recall, but that all of the numbered findings in her report were her own original conclusions based on her investigation, except that Finding No. 4 had been revised. Id. at pp. 101-09.

As to Finding No. 4 regarding the sexting allegation, Martinez testified that everything in that paragraph was in her original findings, except the last sentence. She stated that, during "the back and forth" with BP after her oral report, she was asked whether she would be "comfortable saying that there was an implied acknowledgment by Walter because he ultimately confronted Frampton, Mr. Frampton, on the sexting. And so that was included as – that was – that was added." The only finding as to which "BP wanted some additional language . . . was Item 4 in the last sentence of that paragraph." She agreed to add this sentence because it was supported by the evidence. Id. at pp. 104-05, 108, 139.

The conduct of which Walter was accused by the Open Talk complaint in April 2011 and the findings in July 2011 that he had violated BP's Code of Conduct at that time were not a part of Martinez's investigation. She did not see the prior interviews or investigation report, did not talk to any of the witnesses (Tammy O'Dell, Cheryl McLeod and Mike Rimpley) involved in it and did not know the disposition of the Open Talk complaint. The evidence and any finding that a witness might not have been truthful during that prior investigation would not have been useful to her because, even if the

previous investigation's conclusions were pertinent to her investigation, she needed to remain neutral, perform her own investigation and make independent findings. O'Dell, McLeod, Rimpley and the allegations and disposition of the April 2011 Open Talk complaint were not involved in any of the issues or allegations that Martinez investigated in November 2011. Id. at pp. 158-59, 188-90, 192-95, 197-98, 260-61.

III.    ANALYSIS

A.      The Louisiana Whistleblower Statute, La. Rev. Stat. § 23:967

The general Louisiana Whistleblower Statute provides in pertinent part:

An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
(1)  Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
(2)  Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
(3)  Objects to or refuses to participate in an employment act or practice that is in violation of law.

La. Rev. Stat. § 23:967(A).

In order to prevail on a claim under the Louisiana Whistleblower statute, the plaintiff must establish that: "(1) [her employer] violated the law through a prohibited workplace act or practice; (2) she advised [her employer] of the violation; (3) she then refused to participate in the prohibited practice or threatened to disclose the practice; and (4) she was fired as a result of her refusal to participate in the unlawful practice or threat to disclose the practice." Failure of the plaintiff to provide evidence to satisfy any of these elements must result in summary judgment in favor of the employer.

Myers v. BP Am., Inc., No. 6:08-0168, 2010 WL 3878920, at *4 (W.D. La. Sept. 28, 2010) (quoting Hale v. Touro Infirmary, 886 So. 2d 1210, 1216 (La. App. 4th Cir. 2004)); accord Richardson v. Axion Logistics, LLC, No. 13-302-BAJ-RLB, 2013 WL 5554641, at *6 (M.D. La. Oct. 7, 2013) (citing Hale, 886 So. 2d at 1216).

To establish a claim under this statute, plaintiff must have advised his employer of, or threatened to disclose, an actual violation of state law.  Diaz v. Superior Energy Servs. LLC, 341 F. App'x 26, 28 (5th Cir. 2009) (citing Accardo v. La. Health Servs. & Indem. Co., 943 So. 2d 381, 386-87 (La. App. 1st Cir. 2006); Hale, 886 So. 2d at 1216); Myers, 2010 WL 3878920, at *4, *6 n.12 (citing Hale, 886 So. 2d at 1216); Dillon v. Lakeview Reg'l Med. Ctr. Auxiliary, Inc., No. 2011 CA 1878, 2012 WL 2154346, at *3 (La. App. 1st Cir. 2012), writ denied, 99 So. 3d 651 (La. 2012); Beard v. Seacoast Elecs., Inc., 951 So. 2d 1168, 1170-71 (La. App. 4th Cir. 2007).  "It is insufficient for a plaintiff to merely object to employment practices with which she disagrees or finds distasteful." Dikan v. Cypress Bend Resort, No. 12-2626, 2013 WL 2244635, at *3 (W.D. La. May 21, 2013) (citing Hale, 886 So.2d at 1215).

"Other than this difference, the standards governing claims under the Louisiana Whistleblower statute and Title VII retaliation claims are materially indistinguishable." Delouise v. Iberville Parish Sch. Bd., No. 11-00587-BAJ-RLB, 2014 WL 1248156, at *9 (M.D. La. Mar. 25, 2014) (citing Sprull v. Baton Rouge, 2012 WL 2426793, at *2 (M.D. La. June 26, 2012); Strong v. Univ. Healthcare Sys., L.L.C., 482 F.3d 802, 805 (5th Cir.

2007); Scott v. Turner Indus. Group, LLC, No. 09-872, 2011 WL 5023840 (M.D. La.

Oct. 19, 2011)); accord Kirmer v. Goodyear Tire & Rubber Co., 538 F. App'x 520, 527

(5th Cir. 2013) (citing Strong v. Univ. Healthcare Sys., LLC, 482 F.3d 802, 805 & n.1

(5th Cir. 2007); King v. Phelps Dunbar, LLP, 743 So.2d 181, 187 (La. 1999)).

Thus, under "the familiar McDonnell Douglas [Corp. v. Green, 411 U.S. 792, 802

(1973)], framework," plaintiff

> must first establish a prima facie case of retaliation by proving (1) that he
> engaged in an activity protected by section 23:967, (2) that he suffered an
> adverse employment action, and (3) "that a causal link existed between the
> protected activity and the adverse employment action."  Once the plaintiff
> has established a prima facie case, the burden shifts to the defendant to
> articulate a legitimate, nondiscriminatory reason for the adverse action.  If
> the defendant provides such a reason, the burden then shifts back to the
> plaintiff to prove that the defendant's stated reason is pretextual and
> unworthy of credence.  The plaintiff can meet this burden only by "proving
> that 'but for' the discriminatory purpose he would not have been
> terminated."

Id. (citations omitted).

BP argues that Walter has no evidence that it committed any retaliatory acts in

Louisiana, so that Louisiana law does not apply.  The evidence establishes that Walter

routinely interacted with BP employees located in Louisiana.  His supervisor Chaudhari

and Chaudhari's supervisor, Fontenot, who decided to terminate plaintiff's employment,

were based in New Orleans, as were Klingler and Baker, the Human Resources

employees who coordinated the two investigations into plaintiff's conduct.  They met in

New Orleans with the independent investigator whom they hired for the second

investigation, which led directly to plaintiff's termination. I find these contacts sufficient to apply Louisiana law to Walter's retaliation claim.

Alternatively, BP contends that, if the court finds that Louisiana law applies, Walter's claim under the general Louisiana Whistleblower Statute is preempted by the more specific Louisiana Environmental Whistleblower Statute. If the court finds that the general Whistleblower Statute applies, BP argues that it is entitled to summary judgment on this claim because Walter has no evidence that BP actually violated any state law.

The court need not decide whether Walter advised BP of or threatened to disclose an actual violation of state law. As discussed below, the Louisiana Environmental Whistleblower Statute does not have such a stringent requirement.

### B.    The Environmental Whistleblower Statute, La. Rev. Stat. § 30:2027

The Louisiana Environmental Whistleblower Statute provides:

No firm, business, private or public corporation, partnership, individual employer, or federal, state, or local governmental agency shall act in a retaliatory manner against an employee, acting in good faith, who does any of the following:
(1) Discloses, or threatens to disclose, to a supervisor or to a public body an activity, policy, practice of the employer, or another employer with whom there is a business relationship, that the employee reasonably believes is in violation of an environmental law, rule, or regulation.
(2) Provides information to, or testifies before any public body conducting an investigation, hearing, or inquiry into any environmental violation by

> the employer, or another employer with whom there is a business
> relationship, of an environmental law, rule, or regulation.

La. Rev. Stat. § 30:2027(A).

> Unlike the general Louisiana Whistleblower Statute, section 30:2027(A)

> does not require that there be an actual violation of state law to be
> actionable.  To the contrary, the statute encompasses violations of federal,
> state and local laws, and requires only that the employee reasonably believe
> that an activity or practice is in violation of such an environmental law, rule
> or regulation.  Furthermore, there is at least one Louisiana case which
> supports a cause of action under the statute for merely complaining to one's
> supervisor.

Myers, 2010 WL 3878920, at *8 (citing Cheramie v. J. Wayne Plaisance, Inc., 595 So.

2d 619, 624 (La. 1992); Stone v. Entergy Servs., Inc., 9 So. 3d 193, 199 (La. App. 4th

Cir. 2009); Overton v. Shell Oil Co., 937 So. 2d 404, 410 (La. App. 4th Cir. 2006);

Brown v. Catalyst Recovery of La., Inc., 813 So. 2d 1156, 1167 (La. App. 3rd Cir. 2002);

Chiro v. Harmony Corp., 745 So. 2d 1198, 1200 (La. App. 1st Cir. 1999); Stehl v. Slam

Res., Inc., 1997 La. App. LEXIS 176, p. 8 (La. Ct. App. 1997)).

> There are five requirements for a cause of action under the Louisiana

Environmental Whistleblower Statute:

> 1) employee acts in good faith; 2) employee reports, or threatens to report,
> a violation; 3) employee reasonably believes the activity, policy, or practice
> undertaken by his employer, or another employer with whom there is a
> business relationship with his employer, is a violation of an environmental
> law; 4) employee reports, or threatens to report, the violation to a
> supervisor or to a public body of the employer; and 5) employer acts in

retaliatory manner because the employee reported, or threatened to report, a violation.

Collins v. Louisiana, 118 So. 3d 43, 49 (La. App. 1st Cir. 2013).

To establish a prima facie case of retaliation under section 30:2027(A), "plaintiff must prove: (1) that [he] engaged in a protected activity; (2) that an adverse employment decision followed; and (3) that a causal connection between the two existed." Myers, 2010 WL 3878920, at *6 (citing Gonzalez v. J.E. Merit Constructors, Inc., 263 F.3d 162, 2001 WL 803545, at *2 (5th Cir. 2001); Powers v. Vista Chem. Co., 109 F.3d 1089, 1095 (5th Cir. 1997)).

This standard mirrors the prima facie case of retaliation under Title VII. The parties agree that the same McDonnell Douglas framework applies to retaliation claims under the Louisiana Environmental Whistleblower Statute. "Louisiana courts and federal courts applying Louisiana law have routinely looked to federal jurisprudence to interpret Louisiana employment discrimination statutes." Smith v. Amedisys Inc., 298 F.3d 434, 448 (5th Cir. 2002) (citing Nichols v. Lewis Grocer, 138 F.3d 563, 566 (5th Cir. 1998); King v. Phelps Dunbar, L.L.P., 743 So. 2d 181, 187 (La. 1999)); accord Turner v. Kans. City S. Ry., 675 F.3d 887, 891 n.2 (5th Cir. 2012) (citing Lawrence v. Univ. of Tex. Med. Branch, 163 F.3d 309, 311 (5th Cir. 1999); Knapper v. Hibernia Nat'l Bank, 49 So. 3d 898, 902 n.11 (La. App. 4th Cir. 2010)).

Plaintiff's burden to show retaliation "'at the prima facie stage is not onerous.'" Wiley v. Am. Elec. Power Serv. Corp., 287 F. App'x 335, 340 n.8 (5th Cir. 2008) (quoting Manning v. Chevron Chem. Co., 332 F.3d 874, 883 n.6 (5th Cir. 2003)).  "At this threshold stage, the standard for satisfying the causation element is much less stringent than a 'but for' causation standard."  Manning, 332 F.3d at 883 (quotation and citation omitted).

> If the plaintiff successfully presents a prima facie case, the burden shifts to the employer to provide a legitimate, non-retaliatory reason for the adverse employment action.  If the defendant presents evidence that supports that it acted properly, the fact-finder must decide whether retaliation was the but-for cause for the employer's action.

Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 657 (5th Cir.), cert. denied sub. nom Ketterer v. Yellow Transp., Inc., 133 S. Ct. 136 (2012) (citing Taylor v. United Parcel Serv., Inc., 554 F.3d 510, 523 (5th Cir. 2008); Long v. Eastfield Coll., 88 F.3d 300, 304-05 & n.4 (5th Cir. 1996)) (quotation omitted).

"The employer's burden is only one of production, not persuasion, and involves no credibility assessment."  McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2007) (citation omitted).

> While the defendant is not required to "persuade the court that it was actually motivated by the proffered reasons," in order to satisfy its burden, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for [its decision]." . . .  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity,"; that is, "the inquiry . . . turns from the few generalized factors

that establish a prima facie case to the specific proofs and rebuttals of discriminatory [or retaliatory] motivation the parties have introduced[.]"

Turner, 675 F.3d at 900-01 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 516

(1993); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981)).

Under the Louisiana Environmental Whistleblower statute, an employee's failure to show that his protected actions motivated the employer's termination decision is fatal to his claim. Obviously, an employer cannot retaliate against an employee for engaging in a protected activity that it did not know about at the time of the challenged action . . . . The knowledge of the primary employment decision makers within the company is relevant for this analysis.

Myers, 2010 WL 3878920, at *7 (citing Gonzalez, 2001 WL 803545 at *3; Watts v.

Kroger Co., 170 F.3d 505, 512 (5th Cir. 1999); Powers, 109 F.3d at 1096; Robertson v.

Bell Helicopter, 32 F.3d 948, 952 (5th Cir. 1994); Grizzle v. Travelers Health Networks,

Inc., 14 F.3d 261, 267-68 (5th Cir. 1994)).

To show a causal connection, the Louisiana Environmental Whistleblower statute

requires plaintiff to prove

that he suffered an adverse employment action that was specifically motivated by the employee's internal or external disclosure of an event reasonably believed to be a violation of environmental laws or regulations. "Plainly, for an employer to retaliate against an employee, the employer must be motivated (i.e., form a subjective intent) to take adverse employment action in return for the perceived 'wrongful' conduct of the employee."

Id. at *9 (citing Powers, 109 F.3d at 1094) (quoting Turner v. Cabot Corp., No. 98-0419,

1999 WL 804103, at *2 (E.D. La. 1999)) (emphasis added); see also Powers, 109 F.3d

41

at 1094 ("to retaliate within the meaning of § 2027 requires a showing of illicit motivation"); id. ("[T]he employer [must have] fired the employee because the employee committed the 'wrong' of whistleblowing . . . .") (emphasis added).

BP contends that Walter cannot establish a prima facie case of retaliation under the Louisiana Environmental Whistleblower Statute because he did not engage in any protected activity.  If the court finds that Walter can establish a prima facie case, BP argues that it has proffered legitimate, non-retaliatory reasons for firing him and that he has no evidence to rebut those reasons or to establish that he would not have been terminated "but for" his protected activity.

C.    Plaintiff's Prima Facie Case of Retaliation

Walter's evidence consists primarily of his own testimony, much of which is vague, unspecific and conclusory.  He has submitted a mountain of documents, but the vast majority of them are so tenuously related to the material facts, and his contentions regarding their import are so nebulous, that most of the documents are only tangentially relevant to establishing the legal elements of his retaliation claim.  He has submitted entire deposition transcripts when only a few pages might support his claim.

> Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.  Instead, the party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim.  Thus, [w]hen evidence exists in the summary judgment record but the nonmovant fails even to

refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court.

Williams v. Valenti, 432 F. App'x 298, 302-03 (5th Cir. 2011) (quotations omitted) (citing Smith ex rel. Estate of Smith v. United States, 391 F.3d 621, 625 (5th Cir. 2004); Malacara v. Garber, 353 F.3d 393, 405 (5th Cir. 2003); Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998)); see de la O v. Hous. Auth. of El Paso, 417 F.3d 495, 501 (5th Cir. 2005) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quotation and citation omitted).  Despite these deficiencies, the court has carefully and laboriously reviewed the evidence submitted by both parties in light of their arguments.

It is undisputed that Walter's termination was an adverse employment decision, as required to make out the second prong of a prima facie case under the Louisiana Environmental Whistleblower Statute.  BP argues that he cannot satisfy the first and third prongs, however, because he (1) has insufficient evidence to show that he engaged in any protected activity and (3) therefore cannot establish that a causal connection existed between his (non-existent) protected activity and his termination.

As to protected activity, Walter testified that he repeatedly complained to BP and/or the Coast Guard that BP was not following the Shoreline Treatment Recommendations, Branch Action Plans and Incident Action Plans.  The few specific instances of such complaints that he identified include:

1.     Walter testified that he became aware of problems with the crews working on Cat Island at the end of May 2011, which continued into June and July 2011.  He said

he asked Henley and Brown to look into it, but they would not.  Plaintiff said he eventually asked a Shoreline Cleanup Assessment Team to go there and investigate.  He testified that the Shoreline Cleanup Assessment Team found crews working in areas where they were not supposed to work.  He said the crews were having negative impacts on the environment and were working beyond the scope of the Shoreline Treatment Recommendation.  He testified that BP still didn't do anything until he showed them that they were spending $2.5 million unnecessarily.  He said the Coast Guard would "pop in" to the area.  Record Doc. No. 106-3, plaintiff's unnumbered exhibit, Vol. I of Walter's deposition at pp. 72-79, 115, 129-31, 138-39, 286.[5]

2.      Walter testified that, when Owen Tribble, a member of a Shoreline Cleanup Assessment Team, "went to the island, he told me" that crews were not cleaning in a specific area where they should have been, according to the Shoreline Treatment Recommendation.  Plaintiff testified that he spoke to Tribble at the beginning of June and on June 26, 2011, and he asked Tribble to go to Cat Island to inspect because plaintiff suspected that Operations was "'doing stuff on Cat Island they're not supposed to.'"  Walter received an e-mail from Tribble on July 12, 2011.  Tribble stated that he told the people on the island what they needed to do to clean up and that they agreed with him.  Although Tribble told the workers that the location was not clean, Walter stated that they submitted a Segment Completion Form the same day.  Plaintiff testified that Tribble returned to Cat Island on August 16, 2011, and crews were working in the inner tidal zone, where they were not supposed to work. Record Doc. No. 106-3, plaintiff's unnumbered exhibit, Vol. I of Walter deposition at pp. 126-27; Record Doc. No. 100, plaintiff's unnumbered exhibit, Vol. II of Walter deposition at pp. 291-93.

3.      Plaintiff testified that around September 7-8 or 14-15, 2011, crews were "flying through the segment, not spending time collecting the oil" in Hancock County, and that BP Operations did nothing about it.  Walter said he "raised it to Derwin Henley and then the following day I had asked the Coast Guard to go and provide oversight."  He said BP's crews changed their conduct, collected more oil and complied with the Shoreline Treatment Recommendation while the Coast Guard was there.  Plaintiff testified that "the surprise trip by [the National Park Service] and Coast Guard and the Department of Interior caught [Brown with his crew] on

_____

[5]Plaintiff submitted an apparent rough draft of Volume I of his deposition.  The page numbers in this transcript do not match the page numbers of the same testimony in the partial excerpts from his deposition that BP submitted, which is a final version.

an island [picking up only tar balls greater than 2.5 cm.], and that's what initiated the" memorandum dated October 27, 2011, from the Federal On Scene Coordinator, which more clearly defined the cleanup criteria. Walter testified that when the federal agencies visited East Ship Island on "the 25th" (the testimony is not clear if this means September or October 25, 2011), Brown was there directing crews to pick up only quarter-sized tar balls and he had an argument with someone (not identified by Walter) on the island, who reported back to the Federal On Scene Coordinator. Record Doc. No. 106-3, plaintiff's unnumbered exhibit, Vol. I of Walter deposition at pp. 98, 225-28, 234.

4.     Plaintiff testified that, at some unspecified time, "I had to get the Coast Guard involved" and he told the Coast Guard that "Mike Harrison [Operations Section Chief] and company" were "'trying to make me change [a] process.' I then got that – the comments straightened out by our Federal On Scene Coordinator representative," which may refer to Lt. Montoya of the Coast Guard. Record Doc. No. 100, plaintiff's unnumbered exhibit, Vol. II of Walter's deposition at pp. 287, 332.

5.     Walter stated that Operations wanted to change the segments on which crews were working and to change resources on Petit Bois Island in the last week of October 2011. He said he told unspecified persons in Operations that doing so would violate the Net Environmental Benefit Analysis, which was written by the Federal On Scene Coordinator. Plaintiff testified that Fontenot met with him on November 3, 2011, and told him that people were worried that he was going to quit again. According to him, she referred to his warning to Operations personnel about violating the Net Environmental Benefit Analysis, and she told him that he was too involved in and had to stay out of Operations. He testified that Fontenot told him to "[s]it down with Cory [Brown] and work through this stuff." According to Walter, Fontenot's last words to him were: "I have people watching you, and if you mess up, they're gonna call me." Record Doc. No. 100, plaintiff's unnumbered exhibit, Vol. II of Walter's deposition at pp. 42-47, 57-60, 66-67, 72.

6.     Walter refused to change the Deep Dive slide when Brown asked on November 7, 2011, because he believed that doing so would require falsifying the data.

7.     Walter testified that he sent variance reports monthly or more often to numerous people, including the Coast Guard. Record Doc. No. 106-3, plaintiff's unnumbered exhibit, Vol. I of plaintiff's deposition at pp. 139-40.

Walter contends that his complaints fall under the Louisiana Environmental Whistleblower Statute's requirements that he report or threaten to report conduct that he reasonably believed was a violation of environmental law. BP argues that these actions, even if supported by the evidence, were not protected activity because plaintiff's job was to track and document the work that was accomplished; make sure the work was in compliance and, if there was non-compliance, give notice and make corrections; identify and report variances from plans; and document what was actually cleaned versus what had been planned to be cleaned.

Plaintiff has submitted the declaration under penalty of perjury and the deposition testimony of his expert, Tim Baal. Record Doc. No. 99-3, declaration of Tim Baal dated January 21, 2014; Record Doc. No. 99-7, deposition of Timothy Baal. Assuming without deciding that Baal is qualified as an expert to render his opinions, his evidence, combined with plaintiff's testimony, all construed in the light most favorable to plaintiff, establishes a material fact issue whether Walter engaged in protected activity by reporting or threatening to report actual or suspected violations of environmental law. The Branch Action Plans and Shoreline Treatment Recommendations that Walter was charged with developing, tracking and documenting BP's compliance with them were a part of the Incident Action Plan, which was created pursuant to a complex statutory and regulatory scheme to implement emergency responses to oil and chemical discharges into the navigable waters and environment of the United States. See, e.g., National Oil and

46

Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300, Subpt. B, Responsibility and Organization for Response (implemented under authority of the Clean Water Act, the Oil Pollution Act and the Comprehensive Environmental Response, Compensation and Liability Act). Congress in these broad statutes delegated regulatory authority to the executive branch. According to plaintiff's evidence, the regulations developed under this delegation of authority give the response plans the force of law in the sense that BP, working with state and federal agencies and with the Coast Guard as overseer, was required to craft and implement the minimum standards set by the plans. Therefore, material fact issues exist whether Walter can show that he engaged in protected activity that satisfies the first prong of a prima facie case.

As to the third prong of a prima facie case of retaliation, plaintiff's evidence of a causal connection between his protected activity and his termination is weak, and the court is tempted to find that he fails to establish this prong. However, the standard for satisfying the causation element at this stage is not stringent. Manning, 332 F.3d at 883. The principal evidence of a causal connection in this case is temporal proximity between Walter's alleged complaints about Operations through the summer and into the last week of October 2011, his meeting with Fontenot on November 3 in which she allegedly referred to at least some of these complaints and his confrontation with Brown regarding the Deep Dive slide on November 7, 2011. These events were closely followed by BP

placing plaintiff on administrative leave on November 8, 2011, so that BP could investigate his conduct.

"[A]lthough the mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case, close timing between the protected activity and adverse employment action may provide evidence of a causal link." Schroeder v. Greater New Orleans Fed. Credit Union, 664 F.3d 1016, 1025 (5th Cir. 2011) (citing Swanson v. Gen. Servs. Admin., 110 F.3d 1180, 1188 (5th Cir. 1997)) (quotation omitted); accord Feist v. La. Dep't of Justice, 730 F.3d 450, 454-55 (5th Cir. 2013) (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001); McCoy, 492 F.3d at 562; Evans v. Houston, 246 F.3d 344, 354 (5th Cir. 2001)).  Given this low threshold, I find that Walter has evidence–though weak–that is at least sufficient to create a material fact issue as to the third, causation prong of his prima facie case.

In response to this evidence that Walter may establish a prima facie case, BP has clearly articulated legitimate, non-retaliatory reasons for terminating his employment. The competent summary judgment evidence, consisting primarily of the deposition testimony of Klingler, Fontenot, Chaudhari, Boudreaux and Benedic; Martinez's investigation report, which is supported by her contemporaneous interview notes and her deposition testimony; and some of the contemporaneous documentary exhibits, is sufficient to meet BP's burden of producing evidence, if believed by the trier of fact, that

BP terminated plaintiff for breach of its Code of Conduct.  The evidence fully supports the legitimate, non-retaliatory reasons stated in the termination letter, including that Walter hired Peacock despite a conflict of interest, lied to Klingler and Martinez regarding his knowledge of Peacock's demobilization with no return, and violated BP's employee Code of Conduct by failing to treat employees and contractors fairly or with dignity and respect, including yelling at staff and using threatening behavior that prevented staff from communicating with others on business matters.

> ### D.      Plaintiff Fails to Establish a Material Fact Issue as to "But-For Causation"

The burden therefore shifts to Walter to produce competent evidence that retaliation for his complaints about BP's violation of law, regulations or rules, rather than BP's proffered legitimate, non-retaliatory reasons, was the "but-for cause" of his termination.  In Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2532-33 (2013), the Supreme Court held that retaliation claims are subject to a but-for causation test. "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . .  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Id. at 2533. In other words, "pretext is shown only if the adverse employment action would not have occurred 'but for' the protected conduct."  Reine v. Honeywell Int'l Inc., 362 F. App'x 395, 398 (5th Cir. 2010) (citing Septimus v. Univ. of Houston, 399 F.3d 601, 608 (5th Cir. 2005)).

"In order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." Coleman v. Jason Pharm., 540 F. App'x 302, 304 (5th Cir. 2013) (quoting Long v. Eastfield College, 88 F.3d 300, 308 (5th Cir. 1996)).

Summary judgment is appropriate on Walter's retaliation claim "because, crucially, [he] has not introduced any evidence of causation." Mooney v. Lafayette Cnty. Sch. Dist., 538 F. App'x 447, 456 (5th Cir. 2013) (citing Nassar, 133 S. Ct. at 2533; Banks v. E. Baton Rouge Parish Sch. Bd., 320 F.3d 570, 575 (5th Cir. 2003)).  Mere "close timing between a protected activity and an adverse action, standing alone, is not enough to show but-for causation.  Instead, such temporal proximity must be coupled with other evidence showing a retaliatory motive."  Coleman, 540 F. App'x at 305 n.1 (citation omitted); accord Lorentz v. Alcon Labs., Inc., 535 F. App'x 319, 323 n.5 (5th Cir. 2013); Hernandez, 670 F.3d at 660.

The Fifth Circuit has repeatedly held

> that an employee cannot establish that an employer's reason for termination is pretexual [sic] simply by "disputing the truth of the underlying facts for that reason."  Simply disputing the underlying facts "merely implies that an employer may have made a mistake in deciding to take action against an employee.  Because even an incorrect belief that an employee's performance is inadequate qualifies as a legitimate reason to terminate an at-will employee," an employee must submit evidence to "support an inference that the employer had a retaliatory motive, not just an incorrect belief."

Coleman, 540 F. App'x at 305 (quoting Haverda v. Hays County, 723 F.3d 586, 596 n.1 (5th Cir. 2013)) (emphasis added); accord Lemaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 391 (5th Cir. 2007) (citing Bryant v. Compass Group USA, Inc., 413 F.3d 471, 478 (5th Cir. 2005); Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 899 (5th Cir. 2002); Mato v. Baldauf, 267 F.3d 444, 452 (5th Cir. 2001); Little v. Republic Ref. Co., 924 F.2d 93, 97 (5th Cir. 1991)).

The court must "focus [its] attention on whether [BP's] perception of [Walter's] performance, accurate or not, was the real reason for [his] termination." Harris v. Miss. Transp. Comm'n, 329 F. App'x 550, 557 (5th Cir. 2009) (quotation omitted) (emphasis added). "It is not whether [defendant's] proffered reason was an incorrect reason for her discharge." Laxton v. Gap Inc., 333 F.3d 572, 580 (5th Cir. 2003).

Walter's evidence fails to create a material fact dispute that retaliation was the but-for cause or motive of his termination. During both the investigation of the Open Talk complaint against Walter in April 2011, and the investigation triggered by complaints about his conduct in November 2011, he denied the allegations against him, and he continues to deny them. However, in each instance, the employment decisionmakers weighed Walter's version of events with all of the evidence and concluded that he had violated BP's Code of Conduct in the ways stated in the two final reports.

Walter contends that the findings of the first investigation were flawed because some of the complaining witnesses were not credible. Employers must make credibility

findings in disputed workplace situations.  "Our job as a reviewing court conducting a pretext analysis is not to engage in second-guessing of an employer's business decisions. Our anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones."  Lemaire, 480 F.3d at 391.  "Even if evidence suggests that a decision was wrong, [the court] will not substitute our judgment . . . for the employer's business judgment."  Scott v. Univ. of Miss., 148 F.3d 493, 509-10 (5th Cir. 1998), abrogated on other grounds by Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 72 (2000) (citation omitted).  As a result of the Open Talk complaint investigation, Walter was given a full opportunity to improve his behavior and leadership skills without suffering any adverse employment action.  No inference of retaliation can be drawn from the conduct or results of that investigation.

Both Klingler and Fontenot reviewed the conclusions of Martinez's independent investigation of complaints made against plaintiff in November 2011.  Fontenot decided to terminate him based on that report and her personal knowledge from working with him since May 2011.  Plaintiff's mere denials that he asked BP to hire Peacock, that he violated BP's Code of Conduct or that he committed any of the specific actions listed in Martinez's report or in the termination letter are insufficient to create a material fact dispute about defendant's proffered legitimate, non-retaliatory reasons.  Coleman, 540 F. App'x at 305; Lemaire, 480 F.3d at 391.  "At bottom, [BP] determined . . . that [other witnesses'] statements were more credible than [Walter's] explanations, and, correct or

not, we will not second-guess [BP's] decision to disbelieve [Walter] absent a showing of actual retaliatory purpose."  Harris v. Miss. Transp. Comm'n, 329 F. App'x at 557 (citing Lemaire, 480 F.3d at 391).

None of the conduct that Walter cites leads to any inference that his termination was "specifically motivated" by his disclosure of events that he reasonably believed to be violations of environmental laws, rules or regulations.  Myers, 2010 WL 3878920, at *9.  When he quit on October 14, 2011, which he testified was intended as a statement that BP was not following the plans, Chaudhari, Henley, Brown and Boudreaux listened to his reasons for quitting.  When Fontenot learned the circumstances of plaintiff's resignation, her immediate reaction was to express concern for his safety.  Chaudhari, Henley and Boudreaux encouraged Walter to return to work.  Plaintiff testified that he told Chaudhari and Henley he would return only if BP followed the Shoreline Treatment Recommendations and Branch Action Plans in the future.  His decision to return suggests that he thought BP agreed to this.  Brown, Henley and Boudreaux met with him on October 16, 2011, and it was decided that an additional person would be assigned to help him, which led to Peacock being rehired.

Had BP wanted to get rid of Walter in retaliation for his prior complaints about BP's conduct, his supervisors could have simply accepted his resignation.  Instead, they encouraged him to return to work, agreed that BP would act in accordance with the plans and assigned an additional person to assist him.  The evidence clearly indicates BP's

desire to keep Walter as an employee, despite his prior complaints about its alleged violations of environmental laws and regulations.

When Walter quit, Chaudhari and Fontenot were both concerned about his stress level and mental state.  After he came back to work on October 17, 2011, Grether contacted Klingler to tell her that "several people" had complained to her that plaintiff's conduct had worsened since he returned.  Henley also told Fontenot that he was afraid to deal with issues related to Walter's behavior because Henley feared that plaintiff would quit again.  After plaintiff returned to work, Fontenot received a telephone call from Roy Barrett, the owner of TRG, expressing his concern that Walter had rehired Peacock, when Walter knew that TRG had terminated Peacock for cause.

The sequence of events since Walter quit and returned led Fontenot to tell him on November 3, 2011, that he was too deeply involved in Operations, which was not his job, and to work through his issues with Brown.  In light of the events since October 14, 2011, Fontenot's comment that people were watching Walter and would report to her if he "messed up" leads only to the reasonable inference that she knew that people were having difficulties working with him, he was interfering with the work of others, and she wanted those problems resolved–not that she was intending to retaliate against him.

Brown then called Fontenot on November 7, 2011, to tell her that plaintiff had yelled at Brown in front of the team.  Brown told her that Walter's conduct was degrading and controlling, that people were walking on eggshells around plaintiff, that

they felt they could not speak up, and that the office had been trying to manage Walter's behavior for a long time and could not stand one more day of it.  Based on the calls from Brown and Barrett, Fontenot asked Human Resources to place Walter on administrative leave and to conduct an investigation of him.

Martinez's investigation not only substantiated many of the allegations that had been made, but also uncovered evidence of additional problems.  Her finding that the evidence of sexting between Walter and Peacock was inconclusive, because it could not be corroborated by a second witness, does not undermine her finding that Walter and Peacock had a personal relationship.  Despite plaintiff's denial of sexting, the evidence that Martinez collected showed that he knew that Peacock had been demobilized by TRG for cause and with no return, he lied to Klingler and Martinez about what he knew, he asked that BP rehire Peacock, and he hired Peacock to work in his side business.  The testimony of Martinez, Klingler, Chaudhari and Fontenot supports these findings.  A plausible inference can be drawn from the evidence that Walter and Peacock had a personal relationship, even if it did not include sexting.  Even if the inference was incorrect, Fontenot could, in the exercise of her business judgment, rely on it to decide that plaintiff had a conflict of interest when he asked that Peacock be rehired.

The evidence that plaintiff lied to Klingler and Martinez regarding his knowledge of Peacock's prior separation and that he failed to treat employees and contractors fairly or with dignity and respect was corroborated by multiple witnesses and documents

gathered during the investigation.  The testimony of Fontenot, Chaudhari, Klingler and Martinez and related contemporaneous documents confirm that the investigation was independent and not subject to undue influence from BP.  Once Martinez finalized her report, it was up to Fontenot to decide what action should be taken.

The request by Klingler and Baker that Martinez try to find the information she needed without talking to any Coast Guard personnel does not undermine her findings. It is understandable that BP did not want to involve the Coast Guard in an internal investigation of one of its employees, when none of the allegations involved the Coast Guard.  BP's request did not impede the investigation.

Martinez was not interested in talking to Lt. Montoya regarding whether Walter had complained about BP not following the law, because no one, including plaintiff, ever advised Martinez that any such complaints were or should be at issue in the investigation. Martinez wanted to talk to Lt. Montoya only about Walter's argument with Brown and whether Henley had asked Lt. Montoya not to tell anyone that Walter had quit (which appears to be relevant to any investigation of Henley, rather than Walter).  Martinez testified that she was able to obtain the information she needed from the people she interviewed.  Walter has come forward with no <u>evidence</u> beyond his own speculation that any Coast Guard personnel would have provided relevant information that Martinez did not find in her investigation.  BP provided Martinez with an initial list of potential witnesses based on the questions to be investigated, but BP neither objected to nor

encouraged Martinez to interview any particular witnesses, whether they were employees of BP or third-party contractors.

Similarly, Martinez's testimony that BP's legal department had input into her report before it was finalized in no way undermines her testimony that all of her findings were based on the evidence and were her own findings.  She could not recall any specific revisions that were made, except that she added one sentence to her finding about the sexting messages, upon BP's suggestion.  She testified that she agreed with that sentence and that it was consistent with the evidence she had gathered.

In sum, the competent summary judgment evidence supports Fontenot's business decision to terminate Walter's employment based on Martinez's investigation.  "[A]nti-discrimination laws are not vehicles for judicial second-guessing of business decisions." Mato, 267 F.3d at 452 (quoting Deines v. Tex. Dep't of Protective & Regulatory Servs., 164 F.3d 277, 281 (5th Cir. 1999)); accord Moss v. BMC Software, Inc., 610 F.3d 917, 926 (5th Cir. 2010).  It is immaterial whether Fontenot's decision may have been based on incorrect facts, so long as her decision was not motivated by retaliatory animus. Coleman, 540 F. App'x at 305; Moss, 610 F.3d at 926; Mato, 267 F.3d at 452.  The Fifth Circuit has "emphasize[d] . . . that a fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted on it in good faith."  Cervantez v. KMGP Servs. Co., 349 F. App'x  4, 10 (5th Cir. 2009) (citing Waggoner v. City of Garland, 987 F.2d 1160, 21 1165 (5th Cir. 1993)).

Plaintiff's theory that BP retaliated against him by placing him on administrative leave and investigating his conduct, a mere three weeks after BP's managers begged him not to quit, and then used the investigation as a smokescreen for retaliatory termination, makes no sense and is not supported by any significant, probative evidence. The totality of the evidence creates no issue of material fact and leads to no plausible inference that Fontenot was motivated by retaliation when she decided to fire Walter.

The competent evidence of BP's legitimate, non-retaliatory reasons for its actions is overwhelming, while plaintiff's evidence that BP's proffered reasons are not worthy of belief and that retaliation was the but-for cause of his termination is speculative, conclusory and basically nonexistent. Walter's mere "subjective belief that the incidents were retaliatory, without more, is not sufficient to survive summary judgment." Grice v. FMC Techs. Inc., 216 F. App'x 401, 407 (5th Cir. 2007) (citing Haley v. Alliance Compressor LLC, 391 F.3d 644, 651 (5th Cir. 2004); Travis v. Bd. of Regents, 122 F.3d 259, 266 (5th Cir. 1997)); see Irons v. Aircraft Serv. Int'l, Inc., 392 F. App'x 305, 313-14 (5th Cir. 2010) (summary judgment properly granted on retaliation claim when plaintiff failed to adduce any evidence to support an inference that defendant's proffered justification was pretextual).

Accordingly, BP is entitled to summary judgment as a matter of law on plaintiff's retaliation claims.

E.      Plaintiff's State Law Claims

Walter asserts claims of intentional infliction of emotional distress, defamation, fraud and intentional misrepresentation under Louisiana law.  BP argues that he has no evidence to support at least one essential element of each claim.  As discussed below, I find that plaintiff's evidence fails to establish a material fact issue as to each of these state law claims.

1.      Intentional infliction of emotional distress

Walter complains that BP committed (a) "intentional infliction of emotional distress in the form of injuring Petitioner's reputation among companies that would, but for defendant's libel and slander, would [sic] employ Petitioner" and (b) "intentional infliction of emotional distress in the form of bogus investigations of false charges as retaliation for Petitioner's refusal to falsify reports and compromise his role in the BP cleanup effort" constitute intentional infliction of emotional distress.  Supplemental and Amended Complaint, Record Doc. No. 22 at p. 2.  BP argues that plaintiff has no evidence to establish that it instituted a bogus investigation of false charges, engaged in extreme and outrageous conduct or intended to inflict severe emotional distress.

To establish a claim of intentional infliction of emotional distress, plaintiff must prove that BP's conduct was extreme and outrageous, his emotional distress was severe and BP desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from its conduct.  Iturralde v. Shaw

Group, Inc., 512 F. App'x 430, 435 (5th Cir. 2013) (citing White v. Monsanto Co., 585

So. 2d 1205 (La. 1991)); accord LaBove v. Raftery, 802 So. 2d 566, 577-78 (La. 2001).

Plaintiff's failure to establish any one of these elements is fatal to his claim.

> The Louisiana Supreme Court has stated that the conduct must be
>
> so outrageous in character, and so extreme in degree, as to go beyond all
> possible bounds of decency, and to be regarded as atrocious and utterly
> intolerable in a civilized community.  Liability does not extend to mere
> insults, indignities, threats, annoyances, petty oppressions, or other
> trivialities.  Persons must necessarily be expected to be hardened to a
> certain amount of rough language, and to occasional acts that are definitely
> inconsiderate and unkind.

White, 585 So. 2d at 1209; accord Iturralde, 512 F. App'x at 435; LaBove, 802 So. 2d

at 577-78.

"Conduct which is merely [tortious] or illegal does not rise to the level of being

extreme and outrageous."  Nicholas v. Allstate Ins. Co., 765 So. 2d 1017, 1025 (La.

2000).  Louisiana Civil Code article 2315, from which the cause of action for intentional

infliction of emotional distress derives, "does not create liability for employment

discrimination."  Iturralde, 512 F. App'x at 435 (citing Hornsby v. Enter. Transp. Co.,

987 F. Supp. 512, 515 (M.D. La. 1997)).  "Employment disputes must have some quality

that places them beyond the ordinary in order to qualify for intentional infliction of

emotional distress."  Charles v. JetBlue Airways Corp., No. 08-40, 2009 WL 273206, at

*12 (E.D. La. Jan. 26, 2009) (citing Dean v. Ford Motor Credit Co., 885 F.2d 300 (5th

Cir. 1989)).  "Courts 'have consistently limited causes of action for [intentional infliction

60

of emotional distress] in the workplace to cases which involve a pattern of deliberate, repeated harassment over a period of time.'" Iturralde, 512 F. App'x at 435 (quoting Nicholas, 765 So. 2d at 1026) (internal quotation omitted); accord Ware v. CLECO Power LLC, 90 F. App'x 705, 708 (5th Cir. 2004). "Mere violation of laws regulating conduct in the workplace is not enough to establish intentional infliction." Skidmore v. Precision Printing & Pkg., Inc., 188 F.3d 606, 613 (5th Cir. 1999) (under Texas law, which is identical to Louisiana law).

Thus, actionable cases of intentional infliction of emotional distress arising in the workplace are limited to situations where the distress is "more than a reasonable person could be expected to endure" and the offending conduct is "intended or calculated to cause severe emotional distress." Nicholas, 765 So. 2d at 1026. Mere "disciplinary action and conflict in a . . . workplace environment, although calculated to cause some degree of mental anguish, is not ordinarily" extreme or outrageous. White, 585 So.2d at 1210.

Walter has produced no evidence sufficient to raise a material fact issue that BP engaged in extreme and outrageous conduct while he worked for defendant. Both of the investigations of him were based on serious complaints about his behavior by multiple persons. There is no evidence that plaintiff's disagreements with other employees in the workplace were anything beyond the ordinary. BP's termination of Walter's employment was based on a thorough, independent investigation and on well-supported

61

findings that he had breached BP's Code of Conduct, and there is no competent evidence of retaliatory motive.  BP's actions simply do not rise to the high level of extreme and outrageous conduct to constitute a tort under Louisiana law.  <u>Iturralde</u>, 512 F. App'x at 435.

Plaintiff also has failed to produce evidence that Fontenot, Chaudhari or Klingler intended to inflict severe emotional distress when they instituted either investigation or when Fontenot decided to fire Walter.  Rather, the evidence shows that Fontenot, Chaudhari and Klingler were solicitous of plaintiff's mental health and safety both when he quit in October and when he was placed on administrative leave in November 2011. In October, Chaudhari referred Walter to BP's Employee Assistance Program, which has counselors available to provide support to employees.  Chaudhari also told Walter that he could call Chaudhari any time of the day or night.  In November, Fontenot and Klingler hired Dr. McElhaney to communicate with Walter during his leave because Fontenot was concerned about plaintiff's behavior and wanted to assess whether he might be a risk to himself or others during the investigation.  Dr. McElhaney talked with plaintiff numerous times.  These actions are not indicative of intent to cause severe emotional distress.

As discussed below, plaintiff has not provided any evidence to create a material fact issue that BP intentionally injured his reputation among companies that would, but for defendant's libel and slander, employ him.  Assuming that defamatory actions could

constitute intentional infliction of emotional distress, the absence of any evidence of deliberately false and severely negative comments by BP employees published to third parties means that Walter cannot show either extreme and outrageous conduct or intent to cause severe emotional distress in connection with this allegation.

Because Walter has produced no evidence to create a material fact issue that BP engaged in extreme and outrageous conduct or intended to inflict severe emotional distress, BP is entitled to summary judgment in its favor as a matter of law on this claim.

2.    Defamation

Walter claims that BP committed "libel and slander in the form of false accusations, reports and references to bogus claims of misconduct and incompetence, and claims of 'unfaithfulness', to Petitioner's prospective employers."  Supplemental and Amended Complaint, Record Doc. No. 22 at p. 2.  Defendant argues that plaintiff has no evidence to support any prong of his defamation claim.

> Defamation is a tort which involves the invasion of a person's interest in his or her reputation and good name.  Four elements are necessary to establish a defamation cause of action:  (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury.  The fault requirement is often set forth in the jurisprudence as malice, actual or implied.  See, Cangelosi v. Schwegmann Bros. Giant Super Markets, 390 So. 2d 196, 198 (La. 1980) (which also considers falsity as a fifth and separate element) . . . .  Thus, in order to prevail on a defamation claim, a plaintiff must prove that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages.  If even one of the required elements of the tort is lacking, the cause of action fails.

Costello v. Hardy, 864 So. 2d 129, 139-40 (La. 2004) (quotations and additional citations

omitted); accord Kennedy v. Sheriff, 935 So. 2d 669, 674-75 (La. 2006); Donley v.

Hudson's Salvage LLC, No. 2013 CA 1498, 2014 WL 1165867, at *6 (La. App. 1st Cir.

Mar. 21, 2014) (citing Costello, 864 So. 2d at 139-40).

"By definition, a statement is defamatory if it tends to harm the reputation of

another so as to lower the person in the estimation of the community, deter others from

associating or dealing with the person, or otherwise expose the person to contempt or

ridicule." Id.

> Publication refers to any nonprivileged communication of defamatory
> words, written or oral, and it renders a defendant liable for all republication
> that is the natural and probable consequence of the author's act.
>> An intra-corporate communication, among officers or agents
>> of the same corporation, and in relation to their duties for the
>> corporation, is merely a communication of the corporation
>> itself.  It cannot be construed as being a communication to a
>> third party.   This position is supported by Cangelosi v.
>> Schwegmann Brothers Giant Super Markets, 390 So. 2d 196
>> (La. 1980), in which the Supreme Court found that statements
>> made by and in the presence of other supervisory personnel,
>> to an employee concerning an altered check, did not
>> constitute publication, since the supervisory personnel were
>> essential to the investigation.  We interpret this case to mean
>> that statements between employees, made within the course
>> and scope of their employment, are not statements
>> communicated or publicized to third persons.
> Commercial Union Life Ins. Co., v. Melikyan, 424 So.2d 1114, 1115, (La.
> App. 1 Cir. 1982).
>> However, Commercial Union must be received in conjunction with
>> the case of Heflin [v. Sabine Ass'n of Retarded Citizens, 685 So. 2d 665,
>> 667 (La. App. 3d Cir. 1996)], which requires an additional element of good

faith.  An employer's communication regarding a subject in which it has an interest or a duty is not considered published when made in good faith.

Atwood v. Grand Casinos of La., Inc., 887 So. 2d 634, 638-39 (La. App. 3d Cir. 2004) (quotations and additional citations omitted); accord Marshall v. Circle K Corp., 715 F. Supp. 1341, 1343 (M.D. La. 1989), aff'd, 896 F.2d 550 (5th Cir. 1990); McDaniels v. Hotel Parking Mgmt., Inc., No. 2010-0266, 2010 WL 8972216, at *3 (La. App. 4th Cir. June 16, 2010) (citing Atwood, 887 So. 2d at 639; Doe v. Grant, 839 So. 2d 408, 416 (La. App. 4th Cir. 2003); Bell v. Rogers, 698 So. 2d 749, 749 (La. App. 2d Cir. 1997)).

Plaintiff testified regarding three instances of BP's alleged defamation.  First, he stated that, in April 2012, he was trying to obtain work for his company, TCAAS, from a company owned by Bob Arnold and that Arnold told Walter that he "was radioactive due to [his] case with BP."[6]  Walter testified that Arnold said that he had gone to Houston to speak with BP about a different one of Arnold's companies "and an employee there [named Steven, known as "Sandy," Christian] mentioned [Walter's] name and mentioned that [Walter] had a legal case with BP."  Walter testified that he knew Christian because they had worked together on the spill response in St. Bernard Parish.  Plaintiff stated that Arnold said to him, "sorry I couldn't contact you and used that exact words [sic] radioactive, he said because my – he did not want to ruin his opportunity to work with BP if his name was associated with me."  Arnold did not tell Walter how his name came

---

[6]Plaintiff filed the instant lawsuit in January 2012.

up during Arnold's conversation with Christian.  Record Doc. No. 106-3, plaintiff's unnumbered exhibit, Walter deposition, Vol. I at pp. 12-15.

Second, Walter testified that Melanie Gerald, who worked for a company called Environmental Strategies, asked him for TCAAS's resumé and then advised him "to remove [from the resumé] any instance of me working for BP due to my name being connected to BP and how easily it is for someone to go on the Internet and type August Walter and BP and the first several pages of a Google page come up as this case."  He said he replaced the name "BP" in his resumé with references to having worked on the Deepwater Horizon oil spill response.  Plaintiff did not know if Gerald ever distributed his resumé to any potential employers.  He knew of no other instances when TCAAS was not considered or hired for a job because he was suing BP.  Id. at pp. 15-20.

Finally, Walter testified that the only time that anyone ever told him that he was not being considered or hired individually because of his lawsuit against BP was in October 2012.  He said that he applied for the job of Jefferson Parish telecommunications director and that the parish president and chief administrative officer made him an offer, which he accepted.  He stated that they told him that the Parish Council had to approve the job offer and that they would seek approval from all the Council members before placing the offer on the Council's meeting agenda.  Walter stated that he talked with David Dieser, the parish's emergency management director, two weeks later to find out why his job offer had not yet been placed on the agenda.  He testified that Dieser

66

asked me to right [sic] a letter stating my withdrawal for candidacy for the position and I said why, and he said that, that they're gonna use my litigation I have against BP negatively on the board and block me from being hired at that position.   So he requested that I write a letter of removing my name from candidacy because of that they were gonna it was going to be viewed negatively before the board.

Plaintiff said he wrote the requested letter.  Id. at pp. 23-24.

I find that none of these incidents, or any other evidence, establishes Walter's defamation claim.  First, any statements exchanged between BP employees during the two investigations of plaintiff's conduct and in conjunction with the termination of his employment are intracorporate communications, which do not constitute publication to a third party under Louisiana defamation law.  Even if false, such statements are not publication to third parties and cannot constitute defamation as a matter of law.

Second, and crucially, Walter has failed to produce any evidence to establish that any false and defamatory statements were made about him.  In each of the three instances about which he testified, he stated that the persons involved mentioned that he had a pending lawsuit with BP.  That is a true, non-defamatory statement.  Walter's failure to prove falsity or defamatory words defeats his claim.  New Orleans Craft Temple, Inc. v. Grand Lodge, 131 So. 3d 957, 966 (La. App. 5th Cir. 2013); Henderson v. Bailey Bark Mat'ls, 116 So. 3d 30, 38 (La. App. 2d Cir. 2013); Kirksey v. New Orleans Jazz & Heritage Found., Inc., 116 So. 3d 664, 2012-1351 (La. App. 4th Cir. 2013).

Third, the only evidence of publication of any information by a BP employee to a third party is plaintiff's testimony that Arnold told him that Christian told Arnold that plaintiff had a lawsuit against BP.  Assuming that Christian actually was a BP employee and that his hearsay statement could be verified by admissible evidence, the remark satisfies the publication element.  Again, however, Christian's reported statement was true.  Walter did not produce any evidence that Christian or anyone else published any false and defamatory statements about him.

Because Walter has not provided the court with evidence that raises a material fact issue regarding the falsity or publication elements of his prima facie case of defamation, BP is entitled to summary judgment on this claim as a matter of law.

### 3.   Fraud and misrepresentation

Walter claims that BP committed "intentional fraud and misrepresentation when defendants [sic] intentionally misrepresented their [sic] motives in asking Petitioner to return to work" after he quit in October 2011.  Supplemental and Amending Complaint, Record Doc. No. 22 at p. 3.  He cites "Louisiana Civil Code 153, et seq.," id. at p. 2, as the basis for this claim.  However, that repealed Civil Code article concerned divorce.

Presumably, plaintiff intended to cite Louisiana Civil Code article 1953, which provides:  "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other."  La. Civ. Code art. 1953.  To recover under this article,

which is located in the "Conventional Obligations or Contracts" section of the Civil Code, "'[plaintiff] must demonstrate the existence of a contract.'" Free v. Abbott Labs., Inc., 164 F.3d 270, 274 (5th Cir. 1999) (quoting Newport Ltd. v. Sears, Roebuck & Co., 6 F.3d 1058 (5th Cir. 1993)); accord Benton v. Clay, 123 So. 3d 212, 224 (La. App. 2d Cir. 2013).  Walter has not provided any evidence that he had an employment contract with BP.  Thus, he cannot establish his claim under article 1953.

Perhaps Walter actually intended to assert a tort claim of fraud or intentional misrepresentation under La. Civ. Code art. 2315.

> The elements of tortious fraud are (1) a misrepresentation of a material fact (2) made with the intent to deceive (3) on which plaintiffs justifiably relied, (4) with resultant injury.  Specifically, plaintiffs asserted that defendants had fraudulently induced them to remain in an at-will employment relationship.  To prevail on such a claim, plaintiffs must prove that (1) defendants promised them secure employment, (2) this promise was material to plaintiffs, (3) defendants made this promise to induce them into working for or remaining in defendants' employment, (4) they reasonably relied on defendants' promise, and the additional essential element that (5) defendants "never intended to perform this promise."

Haerting v. One Toucan Du, Inc., No. 94-142, 1995 WL 753143, at *6 (E.D. La. Dec. 19, 1995) (citing La. Civ. Code art. 2315; Newport Ltd., 6 F.3d at 1068) (quoting Franz v. Iolab, Inc., 801 F. Supp. 1537, 1543 (E.D. La. 1992)).  The elements of an intentional misrepresentation claim are the same as for fraud.  Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs., 527 F.3d 412, 418 (5th Cir. 2008).

Plaintiff testified that he told Chaudhari and Henley he would return to work only if BP followed the Shoreline Treatment Recommendations and Branch Action Plans in the future.  His decision to return suggests that he thought BP agreed to this condition. However, Walter has produced no evidence that Chaudhari or Henley made any false statement of material fact or that they made the alleged promise without any intent to perform it or with the intent to deceive plaintiff.  Nor is there any evidence of damages caused by plaintiff's alleged reliance on the promise.

Accordingly, BP is entitled to summary judgment on plaintiff's claims of fraud and intentional misrepresentation.

## CONCLUSION

For all of the foregoing reasons, **IT IS ORDERED** that defendant's motion for summary judgment is GRANTED and that plaintiff's claims are DISMISSED WITH PREJUDICE, plaintiff to bear all costs of these proceedings.

IT IS FURTHER ORDERED that defendant's motions to exclude the expert opinions of Marc L. Zimmerman, Ph.D., M.P., Record Doc. No. 52; John J. Muggivan,

LCSW, ACSW, DCSW, M.E., Record Doc. No. 53; and Michele Allen, LCSW, Record

Doc. No. 51, are DISMISSED AS MOOT.

Judgment will be separately entered.

New Orleans, Louisiana, this _____6th_____ day of May, 2014.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE